Anderson, J.,
delivered the opinion of the court.
This suit was brought by Jonathan Sha-fer against David Coffman’s representatives, to enforce a sale of land to satisfy a debt which he had secured by deed of trust thereon. The lands were conveyed to him by his father, Joseph Coffman, by deed of bargain and sale bearing date the 19th of August, 1844; and the deed of trust conveying them to Allen C. Bryan, trustee, to secure complainant’s debt, was executed by David Coff-man oil the same day, and both deeds were duly recorded. David Coffman died before the suit was instituted, and the plaintiff’s bill was filed in August, 1867, making his widow, Josephine R. A. Coffman, and his administrator de bonis non and his children, together with Joseph Coffman and Abigail his wife, parties defendants, &c. Joseph Coffman and the widow of David Coffman did not answer until September, 1870, more than three years after the bill was filed, and after it had been taken for confessed as against them, and after there had been two interlocutory decrees: *The widow of David Coffman, in her answer, admitted the sale of the land to her husband by Joseph Coffman, and the execution of the deed of trust by her husband, David Coffman, to plaintiff, as alleged in his bill; but she says she is not prepared to admit the existence of said deed of trust in full. She believes and alleges that a very large pro *394 portion of the debt was paid by her husband in his lifetime; and she calls for full proof of said debt, and what were the separate and specific items comprising it. She admits that the proceedings in the injunction suit are correctly set forth in plaintiff’s bill. And she relies on the statute of limitations.
The cause was proceeded with to a hearing on the 2d of May, 1872, when a decree was .pronounced in favor of the plaintiff. The cause was afterwards brought to this court, and was remanded, with instructions to the lower court to allow the petition of Joseph Coffman for a rehearing, which had been refused by the circuit court, to be filed, and- to exclude the testimony of Jonathan Shafer, who was an incompetent witness. I need not take further notice of the action of this court, as it decided no other questions in the case. Upon the return of the cause to the circuit court, the defendants, Joseph Coffman’s ’ executor and devisees, (he having died since it was tendered,) were, allowed to file his petition as a bill of review, and the plaintiff had leave to answer it; which he did.
If the debt is lawful and just, and was secured by a conveyance by the debtor, of the land, in trust by deed duly recorded, and the debtor had a right to convey them, the plaintiff is entitled to a decree of sale, unless it be shown that the debt has been paid, or that his suit is not in time.
There is an allegation in the answer of Joseph Coffman, which is reiterated. in his petition, that there was no ’^consideration given for the bond, but that it was given merely as an indemnity for future advances, which were never made. If the future advances were made, the security would be as valid as it would be if the consideration had been received cotempora-neously with or before the execution of the bond.
The answer to the petition, which may be treated as an answer to a bill of review, and is entitled to all the weight of an answer to a bill in chancery, positively denies these allegations, and moreover exhibits cotempo-raneous proofs of the consideration of the bond for five thousand dollars in the obligor, David Coffman’s, own hand-writing. This proof had not been found when the formal appeal was taken to this court, and was not in the cause when the defendant’s said petition was prepared, nor when it was filed; and with the other proofs, as to the availability of the paper securities which were transferred and assigned to the obligor as the consideration of his said 'bond, and in the entire absence of proof that David Coffman, ever in his lifetime, asserted any liability of complainant as assignor of either of said securities to him as the consideration of said bond which was not promptly met, or that any such liability now exists, it is an overwhelming refutation of both the foregoing allegations, and establishes the fact beyond cavil or controversy that said bond was executed for a full and valuable consideration. The allegation that it was usurious is denied also, and has not a scintilla of evidence in the record to support it. That the debt secured by the deed of trust' was just and lawful, must therefore, be taken to be an established fact in the cause.
That such a deed was executed by David Coffman, conveying two tracts of land, one of 170 acres and the other of 80 acres, (which had been previously conveyed to him by his father, Joseph Coffman,) to Allen C. *Bryan in trust to secure the said debt, which was justly due from him to the plaintiff, is shown by the deed itself; and said deed was duly recorded. Had the debt- or a right to make a conveyance of said lands?
The plaintiff’s bill alleges that the deed of bargain and sale from Joseph Coffman to David Coffman (which upon its face appears to have been for a money consideration), was executed in consequence of an arrange ment and understanding between the partic: that “said David Coffman should pay his,father’s debts, and devoted the purchase money of said land to that purpose.” The allegation to this extent is admitted by Joseph Coffman in his answer. He admits the execution of the deed, and says “although it expressed to be for a certain consideration,” “in truth nc money was paid at all, the deed being executed upon the. express agreement and understanding that it was to be used by David and respondent for the purpose of paying the debts of respondent.” How? By “giving him credit (is the language of the answer) to borrow money on its faith.” To give him, David, credit —not “David and respondent.” How the said conveyance was to be used by David and respondent for ' paying respondents debts, is not very perceptible. It can well be seen how it could be used by David in the way suggested for the payments of debts. But if it was, to be used by respondent, it was his before the conveyance, and might have been used by him for that purpose; but the only way by which he could use the land in the payment of his debts, by conveying to David, was by directing the application of the purchase money thereto; and this is the allegation of the bill. But the inquiry is, had David a right to convey it in trust? If the land was his, he had; and that is alleged by the bill; that the inducement to the conveyance was the payment of the grantor’s debts, and that it was expressly agreed *and understood by the grantor and grantee that the purchase money, the price to be paid for the land, was to be devoted to the payment of the grantor’s debts by the grantee. It is true, as the answer says, no money was paid to the grantor. The understanding was not that the purchase money was to be paid to him, but to his creditors. And the answer admits that the coneyance was made to David to give him credit, that he might borrow money on the faith of it for the payment of his father’s debts; and upon the faith if.it he borrowed $5,000 from the plaintiff, every dollar of which, there can scarcely be a doubt, was devoted to that purpose. It matters not, so far as the validity of the plaintiff’s security is concerned, whether the deed was intended by the Coffmans to invest David with the absolute title to the lands, or whether there *395 was an express or implied trust that after the payment of the debts he was to divide the lauds with his father. It is admitted that both tracts were conveyed to him, in order to enable him upon the faith of the conveyance, that is, upon the land security, to obtain money; which is precisely what he did, in his transaction with the plaintiff, now in controversy. And to hold now, that he had no right to charge the land with the debt, which under that assurance he negotiated, would be a fraud upon the plaintiff. He had a right to convey the land in trust for the security of the plaintiffs dept.
Mas if been shown that this debt has been paid? The answer of Joseph Coffman to the plaintiff's bill, nowhere alleges the payment of the debt, though he intimates that it has been paid, “if it ever existed.” If it never existed, it could not have been paid. He avers that some payments were made by himself on the alleged debt, though he does not admit it, or any part of it, to be due. He speaks of it also as a pretended debt. He admits that a deed of *trust was given by David Coffman to A. C. Bryan, trustee, to secure the payment of an alleged debt to complainant of $5,000. And he says: “This would have been all proper enough, as it was intended that David should obtain credit on the land, if the complainant had in fact loaned the money, but in truth little money, if any, was loaned; some paper, it is said, by both of them, was passed and repassed between them.” This was written and sworn to before complainant had produced cotemporaneous and other evidence showing that David received the full amount of the five thousand dollar bond, if not in money, in paper securities, upon which he got the money, and which was applied to the payment of Joseph’s debts.
. We have seen that the debt for which the security was given, was just and lawful. There is nothing in the foregoing tending to show that it has been paid. The onus is on the defendants.
He files as an exhibit with his answer, a copy of a deed bearing date 7th of October, 18-14, of Joseph Coffman, conveying in trust .to Jonathan Shafer, certain slaves and other personal estate, and some real estate, to secure a debt of $5,883.76, which" he declares by said deed is justly due from him to Dav'd Coffman. He avers in his answer that the large amount of personal property, several thousand dollars of paper and a lot of ne-groes, was conveyed by said deed, all of which passed into the hands of complainant. This is an affirmative allegation. The same is faintly reiterated in the petition, and is responsively and positively denied in the answer of Jonathan Shafer. If it had, as alleged, come into the hands of Jonathan Shafer as trustee for David Coffman, he could not have applied it to his debt, but would have been bound to apply it to David’s debt. This would seem to be a sufficient answer to the allegation. *But the allegation is not true, as the answer to the petition declares; and the answer is supported by the evidence. The allegation is disproved by Hiram Coffman, now executor and devi-see of Joseph Coffman, and his own witness. In answer to the question on cross-examination, “What became of all the paper that was transferred in the deed of trust from Joseph Coffman to Jonathan Shafer, of date of 7th of October, 3 844, and the other personal property named therein?” he answers: “The paper .was left in David’s hands. He collected as he could, and paid off the indebtedness. The personal property was left on the farm. Horses, cattle, &c., were included in the trust. Shafer got cattle and a horse; they were sold to him. Another negro besides Jeff, was sold; the others became free by the result of the war.” This testimony not only contradicts the allegation of the answer of Joseph Coffman, but supports the answer of Jonathan Shafer to Joseph Coffman’s petition or bill @f review. No inference can be drawn from the deed of trust of the 7th of October, that Jonathan Shafer’s debt of $5,000, or any part of it, was paid out of the property or effects, or claims conveyed by that deed.
To the allegation in the petition, that the debt of $5,000 has been paid, there is a flat denial in the answer of Jonathan Shafer. To the allegation of the petition, that said debt of $5,000 was fully adjusted between respondent and David Coffman in the lifetime of the latter, and that the balance due on said debt of about $760, was secured by a new deed of trust executed by David Coffman to Abraham Paul, as trustee, on the 3d of August, 1860, the answer of Jonathan Shafer gives a direct and responsive denial. And he adds, “it is not true that said $5,000 bond was at any time settled, paid off, or fully adjusted, in any way by David Coffman. It is not true that the deed of trust of August 3 860, *had anything to do, or was in any way connected with the $5,000 debt, or that the bond for that debt was ever renewed or lifted out of respondent’s hands by said David' Coffman. It was filed as an exhibit in the injunction suit referred to in said petition, and was destroyed, as respondent supposes, with the record; at any rate he has never seen it since his counsel filed it among the papers in said injunction suit. It is not true, as the petitioner intimates in said petition, that David Coffman, having lifted said bond, filed it among the papers as his voucher; on the contrary, it was filed as evidence of respondent’s subsisting debt against David Coffman, and it perished as the property of respondent and not that of David Coffman.” These answers are responsive to the allegations of the bill, and repel the idea that the said bond of $5,000 has been fully paid, or paid with the exception of the inconsiderable sum of $760; or that the bond of $5,000 was lifted by David Coffman in his lifetime, and the lien on his land was discharged.
And we think the denials of the answer are supported by the presumptions growing out of the circumstances of the cáse. Let us consider first the question as to the non-production of the $5.000 bond. In the plaintiff’s bill, speaking of the injunction suit, he alleges *396 that it was matured for hearing, and upon the hearing at the'October term, 1860, the court decreed that the deed from Joseph Coffman to David Coffman, conveying the land in question, was a good and bona fide deed, and directed an account of rents and profits and of the permanent improvements put upon the land by Joseph Coffman after the sale. Joseph Coff-man virtually admits this allegation in his answer. He says, “while it is true that in the interlocutory decree rendered in said injunction suit in 1830 the deed from respondent to his son David was not set aside, yet the character of the *account directed to be taken, would, in respondent’s opinion, have resulted in directing a conveyance to respondent, at least of that portion of the land allotted to him in the partition between him and David, and in the ascertainment of a liability from David to him, which David could not have met.” ' The1'destruction-of the record of that suit, which Joseph Coffman admits, is a misfortune. He says that “none of the papers are in existence, so far as he knows.” But from what is here disclosed by the bill and answer, it would seem to be important for Jonathan Shafer, as well as David Coffman, that the bond of $5,000 should have been exhibited in that suit, ft is inferable from Joseph Coffman’s answer, that he was seeking to have the whole land reconveyed to him from David. But after the court had established, as he virtually admits, the validity of the conveyance from him to David, and directed an account, upon the taking of that account, he hoped to get a decree reconveying to him at least that portion of the land which had been allotted to him by David. (It appears that he and David, in ’52 or ’53, had made a partition, in which a part of the land had been allotted by David to him.) For he says he expected to show a liability to him by David, which he could not meet. It seems, then, he was seeking a revocation in that suit of his conveyance to David, which, if successful, would greatly prejudice Jonathan Shafer, as his deed upon that land was the only security he had for his bond; and being a party, if he laid by and suffered a decree for a reconveyance of the land, or a part of it, from David to Joseph, upon which his security rested, he might ever afterwards be es-topped to assert his right. And it was important to David, as it would show his liability for a large sum, which'he had borrowed, to pay me purchase *money of the land in the payment of the debts .of Joseph Coff-man.
Jonathan Shafer was a party to that injunction suit, not only as trustee, but also as cestui que trust under several trust deeds which were involved in said suit, according to the testimony of Mr. Kenney. He was cestui-que'trust in only two deeds, one conveying lands to secure the debt of $5,000, and the other conveying negroes to secure three bonds to him and one to Mrs. Yount, dated 3d of August, 1860, about two months before the interlocutory decree in the injunction suit. If there was more than one, both of these deeds were involved in said suit. Heavers that he delivered said bonds to his counsel to be filed as an exhibit in the cause. He doubtless regarded Mr. Kenney, who-had been employed by David Coffman as his counsel, as his counsel too. Mr. Kenney says “he always came and talked to him about the case.” There was no contest between them, or conflict of interest involved in that suit. But they were united in its defence. Mr. Ken-ney’s memory as to some things is not distinct; but he says he and his client (David Coffman, he means,) frequently talked about a bond for a large amount due Jonathan Shafer. This he is certain of. That could have been no ■ other than the bond for $5,000; Mr. Kenney thinks it was for $5,000, and it was then recognized by David Coff-man as a large amount, and as due Jonathan Shafer. He did not claim to have lifted it; it was talked of frequently between them. This injunction suit was brought in 1858 or 1859, and the decree before referred to was maderin October, 1860. These frequent conversations must have occurred between those two periods. He further say's that he recollects, some paper, which he considered highly important as evidence, could not be produced by David Coffman when he wished to file it as evidence. *Of course, then, the paper did not belong to Coffman, and could not have been in his possession. Subsequently Jonathan Shafer and David Coff-man came together to his office and produced the paper he wanted, which he at once filed in the then pending cause. He cannot say which one handed it to him. But there can be no question as to which of them it belonged, and which of them had had the possession of it, as it could not be produced by David Coffman, and was produced when Jonathan Shafer came, who lived’ seventy miles distant. And he states other facts from which he himself infers “that Shafer must have produced the paper.” He also testifies that the papers in the cause were destroyed, and thinks this paper was destroyed with them. Jonathan Shafer swears, in response to Joseph Coffman’s petition, that he handed the bond for $5,000 to his counsel to be filed as evidence in that cause, and supposes it was destroyed with the'other papers in the cause; at least he has never seen it since. And we have seen from what is disclosed as to the subject and objects of” the suit, it was very important for him as well as for David Coffman, that that paper should have been filed as evidence in the suit. Indeed it is proved by James Kenney, the counsel, that is was involved in said' suit. No presumption can arise unfavorable to this hypothesis from his not taking the counsel’s receipt for it, as it was not placed in his hands for collection, and the records of the court would naturally have been regarded as a very safe depository for it. It was not retained by the counsel, but he testifies was at once filed in the cause. We think the non-production of said bond by Jonathan Shafer is sufficiently accounted for, and can justify no presumption unfavorable to his claim. And the testimony of Mr. Kennedy repels the allegation of the petition, that David Coffman had paid the debt, or reduced it to $760, which he included in *397 his *deed of trust of August the 3d, 1860, and lifted the bond for $5,000, and filed it himself in the pending suit as a voucher to show payments he had made for Joseph Coffman. And it supports the answer of Jonathan Shafer, denying such allegation. Indeed it tends strongly, in connection with other facts of the case, to refute the whole theory of the defence, that the $5,000 bond was paid or adjusted by David Coffman, and the lien discharged. These facts we will now proceed to consider.
The first I will notice is the letter from David Coffman to Jonathan Shafer. It is dated June 5th, 1858. It appears from this letter that he had advertised the sale of the negroes; and that he had a talk with his father about it, and said to him, he says, “that [ saw no alternative but to sell land or negroes, and to say which he preferred being done, and no other reply could I get out of him but pursue my own course. I left him at that, and have not since spoken to him on the subject. I believed at the time that he would have done all in his power to have prevented the land from being sold to have paid you your money.” At this lime it is certain, therefore, that the $5,000 bond had not been paid, or the lien lifted from the land. The alternative was to sell land or negroes to pay debts, most probably, mainly for the payment of this debt to Jonathan Shafer. David Coffman evidently preferred, and time has shown wisely, to have sold the negroes. He had advertised them, and it would seem that an injunction had been threatened, for he says to Shafer in said letter, “I do not think any judge can give an injunction,” and he wishes to reconcile his indulgent creditor to that course, for he tells him that he believed if he had elected to sell the land to pay his debt, his father would have done all in his power to prevent the sale of the land to pay it. This letter is a clear and unequivocal acknowledgment that the debt due Jonathan *Shaier, then June 5th, 1858, was a subsisting debt binding the land. And this was the large debt due Jonathan Shafer, about which he, David Coffman, had frequent conversations with James Kenney, after the injunction suit was brought.
On the 10th day of January, 1859, David Coffman executed his bond to Jonathan Shafer for $762.17, payable one day after date. This bond, they say, was given upon settlement for the balance due upon the $5,000 bond, which was lifted. The bond itself does not purport to have been given on settlement for the balance due on said debt. And it is not very credible that David Coff-man would have executed a bond as this is executed, purporting a separate debt, and allowed Shafer to retain his bond for $5,000 and his lien upon the land, if there had been a settlement of the $5,000 bond, and this small bond was given for the balance; nor is it probable that Jonathan Shafer would have surrendered to him the $5,000 bond and taken the smaller one without any security for it. There was no security given for the smaller bond until the 3d of Au°ust. 1860, when David Coff-man received further accommodation of $1,000 from Jonathan Shafer, and executed the deed of trust of that date, conveying a negro woman and four small children to secure both debts, and also a debt of $193.85, with interest from August 27th, 1856, due Jonathan Shafer, and a debt due to Mrs. Yount for about $300 and interest. This precarious and uncertain property, if sold, would hardly have satisfied the debts it was intended to secure and the costs of executing the trust: and is it credible that Jonathan Shafer would have surrendered his safe and substantial landed security for such a frail and insufficient security as this? This bond of $5,000, subject to credits of course for payments which had been made upon it, is recognized by Joseph Coffman, by claiming credit *as late as 1856 for a payment of $120 upon it as of that date. It was recognized by David Coffman, by his letter of June 5th, 1858. And again he frequently spoke of it in conversations with James Kenney, pending the injunction suit which was afterwards brought by Joseph Coffman to prevent the sale of slaves under the deed of trust of 7th of October, 1844, which sale was intended to be made, at least in part, for the payment of this large debt, as is evidently implied by his said letter. And, as wc shall further sec, no presumption of payment can arise from the non-assertion of the debt by Jonathan Shafer. But if the debt was paid or reduced to $762.17, for which the bond afterwards was given, which is embraced in the deed of trust of 3d of August, 1860, it must have been paid on or before the .10th of January, 1859, the date of said bond, and subsequent to the 5th of June, 1858, when its existence as a subsisting debt was recognized by David Coffman’s letter, and also to the conversations, pending the injunction •suit with James Kenney, when it was spoken of as a large debt due Jonathan Shafer.
What were David Coffman’s means to have paid so large a debt at that time? He was arrested in his efforts to raise money by the sale of negroes, by his father’s injunction. He told his father in 1858, that there was no alternative but to sell land or negroes to raise money. We find h;m giving his note of $193 to Jonathan Shafer in August, 1856, which was not paid on the 3d of August, 1860, the date of the deed of trust, and borrowing-money from him in 1860, which is not disputed. And his brother, Hiram Coffman, one of the adverse parties, testifies that he was pressed for money about that time (1880). The Jordan debts were pressing him, and he says further: “After David failed in having his *father’s negroes sold, it was necessary that he should raise money,” and that failure existed from the date of his said letter. It is evident upon the face of this record that he had not the means of paying this debt, or of reducing it to the amount of the bond of the 10th of January, 1859; and in fact, his recognition of its continued obligation, in his frequent conversations with James Kenney, were most probably subsequent to that date. The circumstances and facts of this case very strongly support *398 the responsive and positive denials by the answer of Jonathan Shafer to all the allegations of Joseph Coffman’s petition, to the effect that the $5,000 bond had been paid, or that it had been settled and adjusted between David Coffman in his lifetime, and the balance reduced to $762.17, for which a new bond was given, secured by a deed of trust on negroes and the old bond and the lien upon the land discharged. The only testimony to the contrary is ihe loose and uncertain testimony of one Levi Shafer, of conversations he had held with Jonathan Shafer, and of admissions he made to him, which do not weigh as a feather against the answer, supported as it is by the facts and circumstances of the case referred to, and which are utterly in conflict with-the said witness. Some testimony was given by other witnesses of declarations made by David Coffman in his own favor and adverse to the plaintiff’s claims, which were excepted to by the plaintiff’s counsel. They were clearly inadmissible, and ought to have been excluded from the record, and cannot be considered. From the best view w.e can take of this case, we think the defendants have wholly failed to show .any further payments, of the $5,000 debt due to Jonathan Shafer than those which he 'has admitted, and which have been credited to David Coffman by Commissioner Dangerfield in his report. • *The only remaining question we have to consider, is, Is the plaintiff’s suit in time? is it barred by the statute of limitations? or does his delay in suing create such a presumption against the justice of his demand as ought to defeat it in a court of equity?
Right of action did not accrue upon the bond in question until the 19th of August, 1849, when it fell due. Suit was brought in June, 1867, less than eighteen years after right of action accrued; so that, if it had been an action of debt on the bond, it would not have been barred,, and this suit in equity, by analogy to th.e statute, is not barred.
Has his delay in asserting his claim by suit been such as, under the circumstances of the case, ought to raise the presumption that it is unjust? It is true that he extended very great indulgence to David Coffman, for whom he seems to have had the most friendly regard, and to have been desirous to aid him, as far as he could, in carrying out his contract with his father. But in 1858, about two years after Joseph Coffman had recognized the obligation of the debt upon his son by making a payment on it for him, Jonathan Shafer required it to be paid. This is clearly implied by David’s letter to him, and it is'evident from that letter that David preferred to raise the money by selling the negroes than by selling the land,, which the plaintiff acquiesced in. But that sale was prevented by Joseph Coffman’s- injunction. And as we have seen that, in the' suit he brought, was. not only invólved the sale and conveyance of the land by Joseph to David Coffman, upon which plaintiff’s security rested, but also the deed of trust itself, as we have seen, is shown by the testimony of James Kenney, who was counsel in the case. There was no reason, therefore, why he should bring suit tc enforce his lien *pending that suit, ii which the whole matter would be settled and determined, and if in favor of David Coffman, a sufficient sum would be raisec to pay his debt by the sale of the negroes and it would be unnecessary to sell David Coffman out of his home. It seems that tha, suit was progressing favorably for the interests of David Coffman and the plaintiff, when it was arrested by the war, and finally in 1864 the papers of the suit were destroyed by the enemy. The negroes were emancipated as tin result of the war, and the only alternative lef; the plaintiff to make his debt was to enforce his security on the land; and in July, 1867 soon after the courts were 're-established, ht instituted this suit for 'the purpose. This briej statement of the facts satisfactory account: for the plaintiff’s delay in bringing this suit and in the light of them, we think no pre ■ sumption can arise therefrom unfavorable to him, or to the justice of his claim.
We do not think that the court erred in overruling the defendants’ motion to file a cross-bill after the cause had been decided, although the decree had not been entered; and we think it could not have benefited them if it had been allowed, as they had every advantage under the petition for rehearing, which was treated as a bill of review, that they could have had under a cross-bill..
.We are also of the opinion that the court did not err in not directing an issue to be tried by a jury. There was no application to the court by either party for an issue, and we think that the conclusion to which the court arrived, could hardly have been otherwise if there had been the verdict of a jury. The case was obscured by irrelevant matter thrown into it, and by complications, which could be better cleared away and ■solved by the chancellor than by a jury. If we had any doubts as to *the correctness of our conclusions, the fact that two commissioners and two learned judges have rea’ched the same conclusions, would go far to dispel them.
Upon the whole, we are of opinion to affirm the decree.
Decree affirmed.